STATE of Iowa, Appellee,

v.

Gary Allen MONROE, Appellant.

No. 57540.

Supreme Court of Iowa.

Nov. 24, 1975.

Johnston, Penney & Goetz, Iowa City, for appellant.

Richard C. Turner, Atty. Gen., Earl W. Roberts, Asst. Atty. Gen., Des Moines, and James P. Hoffman, County Atty., Keokuk, for appellee.

REES, Justice.

Defendant was charged by county attorney's information in Lee County with the crime of delivering a controlled substance, specifically, cocaine hydrochloride, allegedly a schedule II substance, as defined in § 204.401, The Code, 1973. The venue of the cause was changed to Henry County. Defendant demurred to the information, alleging the unconstitutionality of §§ 204.-401 and 204.410, The Code, contending they proscribe two separate criminal offenses for delivery of a controlled substance, one a felony, the other a misdemeanor. Following the overruling of the demurrer, the cause came on for trial to a jury. Defendant was convicted, sentenced and now appeals. We reverse and remand for a new trial.

The evidence which was not in fact refuted by defendant tended to show that on August 15, 1973, defendant was contacted by Roger Timcoe, a special agent for the Iowa Division of Narcotic and Drug Enforcement, and one Larry Harriman, a confidential informant. At about 8:30 P.M. on that date, defendant delivered to Agent Timcoe approximately three grams of a substance which was chemically analyzed to be cocaine hydrochloride, for which Agent Timcoe paid defendant $145. On November 27, 1973, defendant was arrested at his home by Agent Timcoe and Detective Beaird of the Keokuk Police Department. At the time of the arrest, a small quantity of marijuana was discovered in a jacket owned by defendant.

Defendant admitted the delivery alleged, but raised an issue of entrapment (which is not before us here) and also maintained the delivery had been an accommodation. The jury found defendant guilty of having delivered a schedule II controlled substance, specifically, cocaine, and at the time the verdict was rendered defendant requested an accommodation hearing pursuant to § 204.410, The Code, which hearing was set for March 13, 1974. On March 12, defendant's counsel and the prosecuting attorney agreed the matter of accommodation would be submitted to the court on the trial record. Trial court found defendant had failed to show by clear and convincing evidence he had delivered the cocaine in question to Agent Timcoe as an accommodation to another individual, and not with intent to profit thereby. He was thereupon sentenced to be confined in the Men's Reformatory for a term of not to exceed ten years, and to pay a fine and costs.

Defendant states the following issues which he asserts entitle him to a reversal:

(1) Trial court erred in permitting the State to inquire during cross-examination of defendant into his alleged possession of marijuana at the time of his arrest.

(2) Trial court abused its discretion in overruling defendant's objection to portions of the county attorney's closing argument.

(3) Trial court erred in failing to find the State had failed to prove each and every element of the crime charged beyond a reasonable doubt, in that cocaine hydrochloride, or cocaine, is not listed as a controlled or narcotic substance by the proscriptive statute, and

(4) That §§ 204.401 and 204.410, The Code, 1973, are unconstitutional, as applied to defendant.

I. In his first issue stated for review, defendant claims trial court erred in permitting the State to question defendant on cross-examination concerning his possession of marijuana at the time of his arrest. Defendant asserts this line of questioning exceeded the proper scope of cross-examination and did not bear on any issue in the case, defendant having been charged only

with the delivery of a controlled substance, specifically, cocaine, or cocaine hydrochloride.

The State contends the line of questioning on cross-examination of defendant was within the proper scope of such examination, by virtue of the fact defendant himself introduced the subject matter on direct examination, and that it was allowable for the purpose of attacking defendant's credibility.

It should be noted that the arresting officers who discovered the marijuana in defendant's jacket at the time of his arrest made no reference to the marijuana in their testimony as a part of the State's case.

In view of our determination of this issue on other grounds we deem it unnecessary to consider the State's contention the line of questioning concerning the presence of marijuana in the pocket of defendant's coat was allowable for the purpose of attacking defendant's credibility. We accordingly focus our consideration of this issue on the question as to whether the interrogation of defendant was permissible because defendant himself opened the subject to inquiry in his own testimony on direct examination.

As a part of the direct examination of defendant by his counsel, the following series of questions and answers appeared in the record:

"Q. Have you ever used any drugs yourself?

"A. Yes, I have.

"Q. What kind of drugs?

"A. I smoke marijuana.

"Q. Have you ever used cocaine?

"A. I have tried it but it didn't agree with me. That was some time ago. That was long before the 15th. That was as much as a year and a half ago.

"Q. You haven't used any since?

"A. No, I haven't.

"Q. Other than this one occasion?

"A. No, other than August 15th.

"Q. Have you used any drugs at all since August 15th?

"A. No, I haven't—I have smoked marijuana.

"Q. Since August 15th?

"A. Yes, but I don't consider marijuana a drug.

"Q. That is not an issue here. But anything other than marijuana?

"A. No."

Also on direct examination, the defendant, speaking of his arrest, testified, "They [Special Agent Timcoe of the Iowa Division of Narcotic and Drug Enforcement and Ken Beaird, detective with the Keokuk Police Department] started to search the house, and I asked them not to, and they went through it anyway and then they took me to jail . . . ." With respect to Agent Timcoe, the defendant also testified, "He started searching my house, and I asked him not to unless he had a warrant, and he said, 'I won't', and then he started going through my bedroom."

On cross-examination of the defendant, the prosecutor inquired of him as follows:

"Q. Now, at that time [of defendant's arrest] did they find any drugs on you?

"A. No, they didn't.

"Q. Now again, I don't want to—for the sake of the jury, would you explain what you think is a drug and what you think is not a drug?

"A. Yes, I will. I think anything that is clinical or home-made or anything of that sort is a drug, but I do not think marijuana is a drug, but they didn't find any on me."

At the time the county attorney began his cross-examination of defendant and had commenced a line of inquiry dealing with the marijuana found in defendant's coat at the time of his arrest, defendant's counsel made what he characterized as a motion in limine with reference to any charge of possession of marijuana as a result of the

search and asking the court to rule that it would be improper for the county attorney's office to go into the matter of the possession of marijuana by defendant for the purposes of impeachment. Trial court held the State had no right to inquire into the matter of any criminal charges growing out of the possession of marijuana, but that the State could inquire as to whether or not he had marijuana in his possession at the time of arrest.

Pursuant to this ruling, the State continued its cross-examination, eliciting from defendant his admission that a small quantity of marijuana belonging to him was found in his coat at the scene of the arrest.

■ Section 781.13, The Code, permits the prosecution to cross-examine a defendant as an ordinary witness, but the State is strictly confined in cross-examination to the matters testified to by the defendant in his examination in chief.

The scope and extent of cross-examination are largely within the discretion of the trial court. *State v. Everett,* 214 N.W.2d 214, 219 (Iowa 1974); *State v. Hinsey,* 200 N.W.2d 810, 815 (Iowa 1972); *State v. Harrington,* 178 N.W.2d 314, 316 (Iowa 1970). Cross-examination may cover fully and fairly all matters raised on direct examination. See *State v. Everett, supra.* Cross-examination of a defendant is not restricted to a "mere categorical review of the matters stated in the direct examination, but may cover any matter referred to, or within the fair purview of, direct examination." *State v. Jensen,* 189 N.W.2d 919, 924 (Iowa 1971), quoting 98 C.J.S. Witnesses § 395, p. 175.

■ Defendant contends the interrogation with respect to the marijuana found in his jacket offends the general rule enunciated in *State v. Martin,* 217 N.W.2d 536 (Iowa 1974), in which we held evidence showing commission of crimes other than one with which an accused stands charged is not ordinarily admissible. We believe, however, that defendant's testimony on direct examination concerning his use of marijuana and concerning the actions of Agent

Timcoe and Detective Beaird at the scene of the arrest sufficiently raised the issue with which the cross-examination was concerned. We accordingly find no abuse of discretion by the trial court in this matter.

II. In his second issue stated for review, defendant asserts trial court abused its discretion in overruling defendant's objections to certain portions of the county attorney's closing argument which he claims were prejudicial to him with respect to statements made, the conduct of the county attorney, and the inferences which could be drawn from the argument. First, he objects to what he characterizes as the prosecutor's representation that Agent Timcoe's life had been endangered by his testimony at trial. Second, he complains that the prosecutor impermissibly asserted his own belief and opinion as to defendant's guilt without reference to any supporting evidence in the record. Third, defendant objects to references by the prosecutor to the need for protection of local children from involvement in the drug culture.

■ Two basic principles govern the review of a record where prosecutorial misconduct in argument has been alleged. First, the reviewing court must determine whether the claimed improper argument was so prejudicial to the defendant that he was denied a fair trial. *State v. Lyons,* 210 N.W.2d 543, 548 (Iowa 1973); *State v. Hephner,* 161 N.W.2d 714, 721 (Iowa 1968); *State v. Harless,* 249 Iowa 530, 536, 86 N.W.2d 210, 213–214. Second, a considerable discretion is vested in the trial court in determining whether prejudice results from trial misconduct on the part of a prosecutor. *State v. Williams,* 217 N.W.2d 573, 575 (Iowa 1974); *State v. Lyons, supra; State v. Vickroy,* 205 N.W.2d 748, 750 (Iowa 1973); *State v. Hephner, supra.* As we said in *State v. Harless, supra,* "[T]he trial court is in a much better position than we are to judge whether claimed misconduct of counsel is so prejudicial as amounts to denial of a fair trial."

Trial court's discretion is not, however, without limitations. "It must be utilized fairly and impartially, not arbitrarily, by application of relevant, legal and equitable principles to all known or readily available facts of a given issue or cause to the end that justice may more nearly be effectuated." *State v. Vickroy, supra,* at page 751.

 With respect to defendant's first allegation of prosecutorial misconduct, the intimation of danger to Agent Timcoe's life, we find in the record the following comment by the county attorney in his rebuttal argument:

"Mr. Timcoe is doing a job and a good job. As a matter of fact, I would like to commend him myself and I think we ought to. That man comes on the stand and through his testimony, he relates these facts. He relates who he is. He's before here in the public and now he gets to walk out tomorrow and go right back on the same situation, same communities, and say, 'Here I am. Do you want to shoot me,' and that's about it."

For the purpose of orderly disposition, we set out next defendant's third allegation of prosecutorial misconduct, the county attorney's references to the need to protect local children from involvement in the drug culture. We excerpt the following two passages from the State's rebuttal argument:

"And, again, I get the impression he [defense attorney] seems to think that we are running some kind of Russia or Hitler regime. We are not here at all for that. *We are here to protect children,* to protect other people." (defendant complains of that portion italicized).

Toward the end of his rebuttal argument, the prosecutor remarked as follows:

"These laws are for a purpose. And they are to be enforced, and they should be enforced, * * * and the evidence supports this. Should be enforced for the protection of children, junior high students, high school students. In this case, you saw, as far as I am concerned, children from ages eighteen to twenty-three, and you saw what kind of background that they had and drug traffic that they have been in. It happens. You have seen for your own self that this, in fact, happens to children. We have to stop this. I don't care whether it is sold to them or delivered to them. We must stop it; and whether people are cooperating or assisting or helping, if it gets to children, cocaine, it goes, Mr. Timcoe stated, to the central nervous system. * * * I ask that God give you the strength to render a decision that is fair, to render a guilty verdict to protect our children, Lee County, and the State of Iowa."

We cannot countenance the above mentioned comments by the prosecutor. There was no evidence in the record tending to show any danger to Agent Timcoe's life as the result of his testimony in this case. The record is also devoid of any evidence linking defendant to deliveries of a controlled substance to junior high students, high school students, or other "children." In essence, the county attorney was, in each of these instances, undertaking to inflame the fears, passion and prejudice of the jury as against defendant by posing hypothetical dangers for which there was no foundation in the evidence adduced at trial.

We condemned similar, if distinguishable, prosecutorial misconduct in *State v. Vickroy, supra.* Though we are mindful of the considerable discretion resting with the trial court in this matter, we must conclude it was abused here. This error requires reversal.

 There is also merit in defendant's contention trial court erred in failing to sustain his objection to the county attorney's assertion of his belief in defendant's guilt. Though defendant complains of two separate instances of such misconduct, we believe only one rises to the level of misconduct requiring reversal.

In his closing argument, the county attorney said, "I know that you will give this the

most thorough thought, and I do believe that the man is guilty, and that you should, in fact, render a verdict of guilty for him."

We considered allegations of prosecutorial misconduct in argument in *State v. Allison,* 260 Iowa 176, 184, 147 N.W.2d 910, 914, and quoted with approval the following from 23A C.J.S. Criminal Law § 1104, page 193:

"As a general rule, it is improper for the prosecuting attorney to express his personal opinion or belief in the guilt of the accused, unless it is apparent that such opinion is based solely on the evidence, and not on any reasons or information outside the evidence."

In *State v. Vickroy, supra,* 205 N.W.2d at 750, we quoted with approval Canon DR 7–106(C)(4) (1971), Iowa Code of Professional Responsibility for Lawyers:

"(C) In appearing in his professional capacity before a tribunal, a lawyer shall not:

" * * *

"(4) Assert his personal opinion * * * as to the guilt or innocence of an accused; but he may argue, on his analysis of the evidence, for any position or conclusion with respect to the matters stated herein."

It is obvious to us the prosecutor expressed his personal belief as to the guilt of the defendant in this case, and that such belief or opinion was not in argument related to the record evidence. This was improper, and trial court abused its discretion in not so holding. Such error also necessitates reversal.

■ III. In his third issue stated for review, defendant attacks the legal sufficiency of the evidence for conviction. Defendant raised this allegation of error by a motion for directed verdict at the close of all evidence and by objection to the use of the word "cocaine" in the jury instructions. The State at trial offered expert testimony that the substance delivered by defendant had been tested and found to be cocaine

hydrochloride. Defendant claims the State failed to prove each and every element of the offense charged beyond a reasonable doubt, alleging "cocaine hydrochloride" is not listed as a controlled or narcotic substance in chapter 204, The Code.

Section 204.206, The Code, defines schedule II controlled substances, and includes:

"Narcotic drugs as defined in this chapter, except those narcotic drugs listed in other schedules."

Section 204.101(17)(d), The Code, defines a narcotic drug, in part, as follows:

" 'Narcotic drug' means any of the following, whether produced directly or indirectly by extraction from substances of vegetable origin, or independently by means of chemical synthesis, or by a combination of extraction and chemical synthesis:

" * * *

"d. Coca leaves and any salt, compound, derivative, or preparation thereof which is chemically equivalent or identical with any of these substances, but not including decocainized coca leaves or extractions of coca leaves which do not contain cocaine or ecgonine."

That cocaine hydrochloride is derived from the coca leaf is indisputable. See, e. g., Remington's Pharmaceutical Sciences at 1068 (Fourteenth ed. 1970). It follows that the drug is clearly a controlled substance and narcotic within the meaning of § 204.-101(17)(d). The legislative intent to regulate cocaine hydrochloride is so clear it need not be discussed.

The main thrust of defendant's argument, however, appears to be that trial court was obliged to direct a verdict in defendant's favor because the prosecution did not explain to the jury that cocaine hydrochloride is a derivative of coca leaves. We reject this argument.

■ The record shows on direct examination Rosetta Hallcok, the State's expert witness, testified to the following matter:

"Q. This controlled substance of which you testified to be cocaine; is that right?

"A. That is correct.

"Q. But a portion of it was? A percent of it was cocaine?

"A. Yes."

There is sufficient evidence present in the record to justify the jury in concluding the substance defendant allegedly delivered was "cocaine hydrochloride" or "cocaine." The Supreme Court of the United States has used the terms interchangeably. See, e. g., *Turner v. United States,* 396 U.S. 398, 90 S.Ct. 642, 24 L.Ed.2d 610.

■■■ The meaning of the provisions of our Uniform Controlled Substances Act is a question of law and an issue for the court, not the jury. *Cassady v. Wheeler,* 224 N.W.2d 649, 651 (Iowa 1974).

We may, and do, take judicial notice of the indisputable scientific fact cocaine, or cocaine hydrochloride, is a substance within the meaning of "narcotic drug" in § 204.-101(17)(d). There was, therefore, no failure in proof by the State in this regard and no error in trial court's instruction and its overruling of defendant's motion for directed verdict. In *United States v. Mills,* 149 U.S.App.D.C. 345, 463 F.2d 291 (1972), the Circuit Court of Appeals for the District of Columbia Circuit considered, *inter alia,* the legal sufficiency of evidence of a sale of cocaine under a federal statute including in the definition of "narcotic drugs," "[a]ny compound, manufacture, salt, derivative, or preparation of coca leaves." 26 U.S.C. § 4731(a)(2) (1964), repealed 84 Stat. 1292 (1970). At 463 F.2d 296, note 27, the Court stated:

" * * * [W]e might take judicial notice * * * that cocaine, as a derivative of coca leaves, is embraced within that definition, a fact judicial authority amply confirms."

It is noteworthy the substance involved in that case was cocaine hydrochloride. Cf. *United States v. Marizal,* 421 F.2d 836 (5

Cir. 1969); *Padilla v. United States,* 278 F.2d 188 (5 Cir. 1960). See also *Coca Cola Co. v. Gemini Rising, Inc.,* 346 F.Supp. 1183, 1189 (E.D.N.Y.1972).

We accordingly find no merit in this issue stated for review.

■■■ IV. Defendant's fourth assignment of error dictates that this court reconsider its decision in *State v. Vietor,* 208 N.W.2d 894 (Iowa 1973), in light of the decision of the Supreme Court of the United States in *Mullaney v. Wilbur,* 421 U.S. 684, 95 S.Ct. 1881, 44 L.Ed.2d 508 (1975).

We are asked to hold unconstitutional in their application to defendant §§ 204.401 and 204.410, The Code, 1973. Defendant also mounts what appears to be an attack on the facial validity of the statutes in question. As material here, § 204.401(1) provides:

"Except as authorized by this chapter, it is unlawful for any person to * * * deliver * * * a controlled substance * * *.

"a. A substance classified in schedule I or II which is a narcotic drug, is guilty of a public offense and upon conviction shall be punished by imprisonment in the penitentiary for not to exceed ten years and by a fine of not more than two thousand dollars."

Section 204.410 provides:

"Any person who enters a plea of guilty to or is found guilty of a violation of section 204.401, subsections 1 or 2, may move for and the court shall grant a further hearing at which evidence may be presented by the person, and by the prosecution if it so desires, relating to the nature of the act or acts on the basis of which the person has been convicted. If the convicted person establishes by clear and convincing evidence that he delivered or possessed with intent to deliver a controlled substance only as an accommodation to another individual and not with intent to profit thereby nor to induce the

recipient or intended recipient of the controlled or counterfeit substance to become addicted to or dependent upon the substance, the court shall sentence the person as if he had been convicted of a violation of section 204.401, subsection 3."

Section 204.401(3) makes possession of a controlled substance, with certain exceptions, unlawful, and provides in pertinent part:

" * * * Any person who violates this subsection is guilty of a misdemeanor, and upon conviction shall be punished by imprisonment in the county jail for not to exceed one year, or by a fine of not more than one thousand dollars, or both such imprisonment and fine. * * * All or any part of a sentence imposed pursuant to this section may be suspended and the person placed upon probation upon such terms and conditions as the court may impose including the active participation by such person in a drug treatment, rehabilitation or education program approved by the court."

Defendant alleges §§ 204.401 and 204.410 are unconstitutional because they shift the burden of proof from the State to the defendant in violation of his right to due process; they abridge defendant's right to a jury trial; they abridge defendant's right to freedom from self-incrimination and because § 204.401 includes an unconstitutional assumption an accused is not an accommodator.

We rejected the same arguments in *State v. Vietor, supra.* A majority of this court there held: Section 204.401(1) created a separate and distinct crime without regard to the purpose or motive of the deliverer; section 204.410 established only a postconviction sentencing procedure by which the convicted person may, if he desires, offer evidence in mitigation of sentence; and, therefore, the challenged statutes did not suffer from the constitutional infirmities alleged.

We have continued to follow our decision in *Vietor.* See *State v. Deanda,* 218 N.W.2d

649 (Iowa 1974); *State v. Frank,* 214 N.W.2d 915 (Iowa 1974). The principles announced in *Vietor* and its progeny would be dispositive of this challenge but for the United States Supreme Court's recent pronouncements on the requirements of due process in *Mullaney, supra.* Those pronouncements speak so directly to the facial invalidity of § 204.410 in its present form that we must overrule *Vietor* and its offspring and hold the section violative of due process.

The foundation of *Mullaney* was laid in *In re Winship,* 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970). There the Supreme Court considered the standard of proof required to incarcerate a juvenile offender under a statute which made a juvenile offense one which "if done by an adult, would constitute a crime." 397 U.S. at 359, 90 S.Ct. at 1070. Under that statute, a child could be committed to state institutions on the basis of proof by a preponderance of the evidence. In holding a juvenile proceeding must follow the same standard of proof as is employed in an adult proceeding, the Court said at page 364 of 397 U.S. at page 1073 of 90 S.Ct.: "[T]he Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged."

The Supreme Court emphasized the critical interests requiring the protection of the reasonable doubt standard included the accused's interest in his liberty and reputation and society's interest in maintaining confidence and respect in its application of the criminal law.

*Mullaney* involved a federal habeas corpus proceeding to vacate a murder conviction. The State of Maine recognizes only two kinds of homicide, murder and manslaughter. The rule in that state had been that once the State established a homicide was both intentional and unlawful, malice aforethought, a necessary element for murder conviction, would be conclusively implied unless the defendant proved by a fair

preponderance of the evidence that he acted in the heat of passion on sudden provocation. If the defendant met that burden, he would be guilty of manslaughter, not murder. A conviction for manslaughter carries a maximum penalty of a $1,000 fine or imprisonment for not more than 20 years, whereas a murder conviction carries a mandatory life sentence.

The Maine Supreme Judicial Court had construed the manslaughter statute and the murder statute as creating only different degrees of the single generic offense of felonious homicide, characterizing the "heat of passion upon sudden provocation" requirement for manslaughter as merely a "reductive factor." *State v. Wilbur*, 278 A.2d 139 (Me.1971).

Based upon that construction of its statutory scheme, the State of Maine and the warden of the Maine prison argued against the extension of *Winship* in *Mullaney*. They noted that the absence of heat of passion on sudden provocation was not a "fact necessary to constitute the crime" of felonious homicide. They asserted this was relevant, because in *Winship* the facts at issue were essential to establish criminality in the first instance whereas the fact in question in *Mullaney* did not come into play until the jury already had determined that the defendant was guilty and might be punished at least for manslaughter. In this situation, they maintained, the defendant's critical interests in liberty and reputation were no longer of paramount concern, since irrespective of the mitigating factor, he would be likely to lose his liberty and to be stigmatized. *Mullaney, supra,* 95 S.Ct. at 1888–1889.

The Supreme Court rejected this argument, saying at page 1889 of 95 S.Ct.:

"This analysis fails to recognize that the criminal law of Maine, like that of other jurisdictions, is concerned not only with guilt or innocence in the abstract but also with the degree of criminal culpability. Maine has chosen to distinguish those who kill in the heat of passion from those who kill in the absence of this factor. Because the former are less 'blameworth[y],' * * * they are subject to substantially less severe penalties. By drawing this distinction, while refusing to require the prosecution to establish beyond a reasonable doubt the fact upon which it turns, Maine denigrates the interests found critical in *Winship.*

"The safeguards of due process are not rendered unavailing simply because a determination may already have been reached that would stigmatize the defendant and that might lead to a significant impairment of personal liberty. The fact remains that the consequences resulting from a verdict of murder, as compared with a verdict of manslaughter, differ significantly."

At the same page, the Court continued:

"Moreover, if *Winship* were limited to those facts that constitute a crime as defined by state law, a State could undermine many of the interests that decision sought to protect without effecting any substantive change in its law. *It would only be necessary to redefine the elements that comprise different crimes, characterizing them as factors that bear solely on the extent of punishment.*" (emphasis supplied)

In light of *Mullaney,* the conclusion is inescapable that § 204.410 unconstitutionally shifts the burden to defendant to demonstrate his delivery of a controlled substance was an accommodation. Our legislature has chosen to distinguish between those who deliver only as an accommodation and those who do not, subjecting the former to less severe penalties. Despite the obvious beneficent purpose of § 204.410, its grant of lenity is accomplished in an unconstitutional manner.

We are, therefore, constrained to overrule our holdings in *State v. Vietor, supra,* and all of the succeeding cases which followed and rearticulated our holding therein, and we do now depart therefrom and overrule such holdings insofar as they deal with this

issue. In the light of *Mullaney*, the prior pronouncements of this court interpreting or construing § 204.410 no longer have viability.

V. Our holding above, however, does not end our consideration of this issue in defendant's appeal. Difficult and delicate tasks remain. We must now determine:

(1) whether § 204.410 must fall in its entirety and, if it must, whether § 204.-401 is so interrelated with the former section in a legislative scheme that it must also fall; or whether, conversely, we may excise the offensive portions of § 204.410 and render it constitutionally adequate without destroying the legislature's scheme or exceeding our proper judicial powers;

(2) whether, if we are able to salvage a viable portion of § 204.410, we must then read into it a constitutional requirement that defendant have the right to a jury trial on the accommodation issue; and

(3) whether the constitutional principles we now announce are to be applied retroactively, or whether they are to operate only prospectively.

These questions are necessarily somewhat interrelated. We attempt, however, to separate them, insofar as is possible, for the purpose of analysis.

We are guided by our prior case authority, specific statutory direction, and familiar principles of statutory construction.

■ It has been said that "[w]hether or not the judicial determination of partial invalidity will so disembowel the legislation that it must fall as a whole, or whether the valid portion will be enforced separately is a question of importance second only to the initial determination of validity." 2 Sutherland Statutory Construction § 44.02, page 335 (Sands Fourth Ed.1973). Succinctly stated, our task is to determine whether the offensive portion of the statute may be excised and still leave a viable statute expressive of legislative intent. See *State v. Aldrich*, 231 N.W.2d 890, 895 (Iowa 1975).

■ It has been said, "the cardinal principle of statutory construction is to save and not to destroy." *State v. Blyth*, 226 N.W.2d 250, 261 (Iowa 1975), quoting *Tilton v. Richardson*, 403 U.S. 672, 684, 91 S.Ct. 2091, 2098, 29 L.Ed.2d 790, 802. This court has the power and the duty to construe the statutes of the state in such a way as to preserve them and render them consistent with the state and federal constitutions, if that is possible. See *State v. Rasmussen*, 213 N.W.2d 661 (Iowa 1973); *State v. McGuire*, 200 N.W.2d 832 (Iowa 1972); *Graham v. Worthington*, 259 Iowa 845, 146 N.W.2d 626. We have acknowledged our duty to sustain as much of a legislative enactment as possible if the good is separable from the bad. *Frost v. State*, 172 N.W.2d 575, 586 (Iowa 1969).

In *State v. Blyth, supra*, at page 262 of 226 N.W.2d, we quoted approvingly the following from 82 C.J.S. Statutes § 93, pages 154–155:

"Whether the valid and the invalid parts of a statute are independent and separable, or interdependent, is a question of construction and of legislative intent, as indicated by the words employed and the considerations underlying the enactment of the statute, and the question is not one of legislative power. A statute may be unconstitutional in part and yet be sustained with the offending part omitted, if the paramount intent or chief purpose will not be destroyed thereby, or the legislative purpose not substantially affected or impaired, if the statute is still capable of fulfilling the apparent legislative intent, or if the remaining portions are sufficient to accomplish the legislative purpose deducible from the entire act, construed in the light of contemporary events.

"If, when the invalid part is stricken, that which remains is complete in itself and capable of being executed in accordance with the apparent legislative intent, or purpose, wholly independent of that which was rejected, it must be sustained to that extent; * * *."

The converse of the above proposition acts as a limit on our power to partially invalidate a statute and leave the constitutionally inoffensive portions in force. If it appears the legislature probably would not have enacted the statute at all if the invalid part had been eliminated, then the whole must fall. *Frost v. State, supra,* 172 N.W.2d at 586. It is also a well-established canon that the construction given a statute should be sensible, practical, workable, and such as will avoid absurd results. See, *e. g., Iowa Nat. Indus. Loan Co. v. Iowa State Dept. of Revenue,* 224 N.W.2d 437, 440 (1974); *Olsen v. Jones,* 209 N.W.2d 64, 67 (Iowa 1973); *Northern Natural Gas Co. v. Forst,* 205 N.W.2d 692, 695–696 (Iowa 1973).

We must also recognize we are inhibited by the very nature of our judicial power. It is not our function to rewrite a statute. *State v. Kueny,* 215 N.W.2d 215, 219 (Iowa 1974). If changes in a law are desirable from a standpoint of policy or mere practicality, it is for the legislature to enact them, not for the court to incorporate them by interpretation. *State v. Wedelstedt,* 213 N.W.2d 652, 656–657 (Iowa 1973).

Our inquiry into legislative intent is aided by our general severability statute, § 4.12, The Code, which provides:

> "4.12 Acts or statutes are severable. If any provision of an Act or statute or the application thereof to any person or circumstance is held invalid, the invalidity does not affect other provisions or applications of the Act or statute which can be given effect without the invalid provision or application, and to this end the provisions of the Act or statute are severable."

More particularly, we are unequivocally instructed by the specific severability clause passed with our Uniform Controlled Substances Act. At Ch. 148, § 612 (1971), Acts of the Sixty-fourth General Assembly 334, we find:

> "If any phrase, clause, subsection or section of this Act shall be declared unconstitutional or invalid by any court of competent jurisdiction, it shall be conclusively presumed that the legislature would have enacted this Act without the phrase, clause, subsection or section so held unconstitutional or invalid; and the remainder of this Act shall not be affected as a result of such part being held unconstitutional or invalid."

Being mindful of the above considerations, we turn to the task at hand.

We reject the alternative of striking down § 204.410 in its entirety, leaving § 204.401 to stand on its own. Compelling reasons render such action inappropriate.

We discern a legislative scheme linking together § 204.401 and § 204.410. The legislature obviously intended to treat accommodation deliverers less harshly than non-accommodators, and we believe that subjecting all drug deliverers to § 204.401 alone would frustrate the legislature's will.

Furthermore, such action would, in effect, be an impermissible enlargement of § 204.401. A court may not, under the guise of construction, extend or enlarge the terms of a statute. *City of Cedar Rapids v. Moses,* 223 N.W.2d 263, 268 (Iowa 1974); *State v. Wedelstedt, supra,* 213 N.W.2d at 656. To extend the scope of an Act's operation by invalidating a provision of limitation while allowing the remainder to continue in effect is to invite criticism that it amounts to judicial legislation. See 2 Sutherland Statutory Construction, *supra,* § 44.13, page 359.

Finally, we are mindful of our duty to save the good portion of the statute if the offensive parts can be removed. We believe the offensive language of § 204.410 can be excised, leaving a viable statute expressive of legislative intent. We therefore set out the section below, and strike the constitutionally violative clauses contained in brackets:

> "204.410 Reduced sentence for accommodation offenses. Any person who enters a plea of guilty to or is found guilty

of a violation of section 204.401, subsections 1 or 2, may move for and the court shall grant a further hearing [at which evidence may be presented by the person, and by the prosecution if it so desires,] relating to the nature of the act or acts on the basis of which the person has been convicted. If the convicted person [establishes by clear and convincing evidence that he] delivered or possessed with intent to deliver a controlled substance only as an accommodation to another individual and not with intent to profit thereby nor to induce the recipient or intended recipient of the controlled or counterfeit substance to become addicted to or dependent upon the substance, the court shall sentence the person as if he had been convicted of a violation of section 204.401, subsection 3."

With the unconstitutional portion of the statute eliminated, the constitutionally mandated principle of *Mullaney* must be read into the remainder. That is, in the hearing the burden is upon the State to prove beyond a reasonable doubt that the defendant did not "deliver or possess with intent to deliver a controlled substance only as an accommodation to another individual and not with intent to profit thereby nor to induce the recipient or intended recipient of the controlled or counterfeit substance to become addicted to or dependent upon the substance."

VI. We must decide next whether *Mullaney* requires that we read into the viable portion of § 204.410 the constitutional principle that a defendant is entitled to have a jury decide the issue in question in that section. We hold that it does so require.

■ It is our reading of *Mullaney* that an issue such as defendant's *mens rea* is an element of the offense and cannot be converted to an issue affecting only mitigation of punishment. Because the accommodation issue is an element of the offense, and the offense is of a class triable by jury at common law, the right to trial by jury pertains. See *State v. Vietor, supra,* 208

N.W.2d at 901 (dissenting opinion by McCormick, J.), citing 47 Am.Jur.2d Jury § 17, pages 639–640.

■ We believe the constitutional requirements of *Mullaney* can be met by the employment of a procedure similar to that relating to a habitual criminal charge. When a defendant is charged as a habitual criminal under Code chapter 747 he is statutorily entitled to a two-stage trial. See *State v. Hunley,* 167 N.W.2d 645 (Iowa 1969); § 785.16, The Code, 1975. If found guilty of the current offense, he is entitled to a trial on the issue of his alleged prior convictions.

■ We think that after trial for delivery of a controlled substance, upon a guilty verdict, or if there is no trial, upon a plea of guilty, the defendant must be accorded the opportunity to have the intent issue of § 204.410 resolved by jury. The jury which resolved the main issue of defendant's guilt at trial could in those situations hear the matter.

It is our conclusion the holdings and principles set out above preserve all but the infirm part of the legislation and afford the defendant basic constitutionally mandated rights. The statutory scheme, with its attendant purpose is, we believe, left intact.

VII. Finally, we must decide whether the constitutional principles announced above are to be given retroactive effect, or whether they may be made to operate prospectively only. We conclude the requirement that the State prove beyond a reasonable doubt a defendant deliverer was not an accommodator must be given complete retroactive effect, whereas the requirement that a jury determine the accommodation issue shall operate retroactively only to trials begun after the date of the filing of this opinion.

■ Although at common law there was no authority for the proposition that judicial decisions made law only for the future, it is now well settled that the constitution neither prohibits nor requires retro-

active application of such decisions. *Linkletter v. Walker*, 381 U.S. 618, 622–629, 85 S.Ct. 1731, 1734–1737, 14 L.Ed.2d 601, 604–608. The effect of a subsequent ruling of invalidity on prior judgments is subject to no set principle of absolute retroactivity. *Linkletter, supra*, 381 U.S. at 627, 85 S.Ct. at 1736, 14 L.Ed.2d at 607.

■ In a substantial number of opinions subsequent to *Linkletter*, the United States Supreme Court has consistently looked to a number of considerations in determining the extent to which a change of law will be made retroactive. These considerations include the purpose of the new standards, the reliance which may have been placed upon prior decisions on the subject, and the effect on the administration of justice of a retroactive application. See, e. g., *Gosa v. Mayden*, 413 U.S. 665, 93 S.Ct. 2926, 37 L.Ed.2d 873; *Desist v. United States*, 394 U.S. 244, 89 S.Ct. 1030, 22 L.Ed.2d 248; *Stovall v. Denno*, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199; *Johnson v. New Jersey*, 384 U.S. 719, 86 S.Ct. 1772, 16 L.Ed.2d 882; *Tehan v. Shott*, 382 U.S. 406, 86 S.Ct. 459, 15 L.Ed.2d 453. Underlying all of the considerations above is the basic inquiry as to how seriously the invalid prior rule affected the very integrity of the fact-finding process or produced the clear danger of convicting the innocent.

In *Williams v. United States*, 401 U.S. 646, 653, 91 S.Ct. 1148, 1152, 28 L.Ed.2d 388, 395, the Court emphasized:

"Where the major purpose of new constitutional doctrine is to overcome an aspect of the criminal trial that substantially impairs its truth-finding function and so raises serious questions about the accuracy of guilty verdicts in past trials, the new rule has been given complete retroactive effect. Neither good-faith reliance by state or federal authorities on prior constitutional law or accepted practice, nor severe impact on the administration of justice has sufficed to require prospective application in these circumstances." [footnote omitted].

This court has followed the considerations advanced by the United States Supreme Court in determining whether to give retroactive effect to changes of law. See *Everett v. Brewer*, 215 N.W.2d 244, 247–248 (Iowa 1974); *State v. Thrasher*, 175 N.W.2d 397, 399–402 (Iowa 1970); *State v. Jackson*, 173 N.W.2d 567, 569–570 (Iowa 1970); *State v. Wisniewski*, 171 N.W.2d 882, 887–888 (Iowa 1969).

■ We are obliged to say our holding above that the prosecution bear the burden of proof beyond a reasonable doubt in § 204.410 proceedings must be given complete retroactive effect. This is mandated by the United States Supreme Court's decision in *V. v. City of New York*, 407 U.S. 203, 92 S.Ct. 1951, 32 L.Ed.2d 659. There the Court gave the constitutional standard of proof beyond a reasonable doubt announced in *Winship* complete retroactive effect, noting the clear purpose of the standard was to overcome an aspect of a criminal trial that substantially impairs its truth-finding function. See *Williams v. United States, supra*.

■ Different considerations govern the time of application of our holding respecting the right to a jury determination. In *DeStefano v. Woods*, 392 U.S. 631, 88 S.Ct. 2093, 20 L.Ed.2d 1308, the United States Supreme Court held the rule of its earlier decision in *Duncan v. State of Louisiana*, 391 U.S. 145, 88 S.Ct. 1444, 20 L.Ed.2d 491, that states cannot deny a request for jury trial in serious criminal cases would receive only prospective application. The factors there considered are equally applicable and persuasive to the issue here.

We perceive no inconsistency in giving complete retroactive effect to one principle announced in this case and limiting another principle to prospective operation. For an analogous result in a case involving statutory construction, see *Schultz v. Gosselink*, 260 Iowa 115, 148 N.W.2d 434.

To summarize this division, we conclude:

(1) The constitutional requirement concerning the burden of proof announced in this case is completely retroactive.

(2) The constitutional requirement concerning the right to a jury determination is applicable only to trials or retrials begun after the date of the filing of this opinion.

(3) Relief flowing from the constitutional adjudication in this opinion is available only in (a) the case at bar, (b) cases now pending on appeal where error has been properly preserved at trial, and (c) cases in which timely appeal is hereafter taken and in which error has been properly preserved.

In keeping with the foregoing, this case is, therefore, reversed and remanded for a new trial and further proceedings in conformity with this opinion.

Reversed and remanded.

All Justices concur, except RAWLINGS, J., who concurs in result.