STATE of Iowa, Appellee,

v.

Robert Eugene PILCHER, Appellant.

No. 57756.

Supreme Court of Iowa.

May 19, 1976.

See also, Iowa, 242 N.W.2d 367.

Barnes, Schlegel & Walter, Ottumwa, for appellant.

Richard C. Turner, Atty. Gen., Thomas Mann, Jr., Asst. Atty. Gen., Samuel O. Erhardt, County Atty., for appellee.

MASON, Justice.

Defendant, Robert Eugene Pilcher, appeals from judgment imposed following his conviction by a jury of the crime of sodomy in violation of section 705.1, The Code. Although several issues are presented for review, defendant primarily challenges the constitutionality of this statute.

A Wapello County grand jury had indicted Robert Eugene Pilcher for the crime of sodomy. Before commencement of trial defendant filed application to withdraw his not guilty plea and for permission to file a demurrer. The demurrer, which was overruled, alleged the sodomy statute is unconstitutional in these respects: (1) it is an improper exercise of the police power; (2) it violates the due process and equal protection clauses; (3) it is unconstitutionally vague and overbroad; (4) it invades the right to privacy; and (5) section 705.2, The Code, implements cruel and unusual punishment.

The events leading to defendant's conviction occurred April 5, 1974. According to the testimony of barmaid Roma Charlyn Waterhouse, defendant forced her to commit fellatio upon him at a farm outside the city of Ottumwa. The events of April 5 commenced at the Tom Tom Tap in Ottumwa, where Mrs. Waterhouse met with defendant in the early afternoon. The two conversed in the tavern for about one hour, at which time they left together, ostensibly to look at defendant's new car.

They apparently drove her car to a public parking lot, whereupon they got into defendant's car and drove to a farm located in Wapello County owned by defendant's cousin, Max Marlin. The new car was supposed to be located at this farm.

Upon their arrival at the Marlin farm, defendant went to the house to get some keys, unlocked the padlocked door and suggested to Mrs. Waterhouse she come in the house. The couple proceeded into the kitchen where a five minute conversation ensued. As they started for the door, which apparently was in the front bedroom, another conversation commenced, whereupon Roma glanced at her watch and remembered she had no time for "fun games." At this point it was some time after 2:00 p. m.

Defendant then backed Roma into the bedroom. When she tried to walk around him he grabbed her arm, twisted it, then handcuffed her arms behind her and forced her down to a mattress on the floor. Defendant then removed her slacks and underwear, pushed up her sweater, and started to disrobe himself. Roma stated on cross-examination she believed defendant wished to have what she described as "normal" sexual intercourse, to which she would have agreed. In this connection, it was also adduced defendant and Roma had spent an hour on a previous occasion wherein they participated in "normal" sex at the farm.

In any event, it was not long until Roma realized defendant wanted something other

than "normal" sex. She was objecting to this forced fellatio as she was "not very fond of that." After the first insertion, Roma informed defendant she had a piece of candy in her mouth. Because her hands were handcuffed behind her back, apparently, defendant removed the candy. This procedure was repeated upon Roma's informing defendant she also had false teeth. After defendant attained his climax, he removed the handcuffs and Roma cleaned up and got dressed.

Defendant then stated he would be in trouble with four other men as he was supposed to leave her at the farm for them. They then returned to Ottumwa and the parking lot where her car was located by about 3:00 p. m. A 15 minute conversation followed.

It was adduced during examination of Roma she neither struggled, kicked or tried to bite defendant during the events down on the farm. Furthermore, she related the facts to no one until talking with Mr. Wendell Plim the evening of April 5. She waited until the "early morning hours" of the next day to tell her husband what had happened. He did not believe her as she divulged no names. In any event, Roma did state during trial she never consented to the act of fellatio.

Defendant's testimony contradicted most of the foregoing story. On the day of April 5, defendant drove his wife Diane to work at about noon. After purchasing cigarettes, he proceeded to the Hotel Ottumwa to discuss collecting unpaid bills for pest control. He then went to the Tom Tom Tap for a Pepsi Cola, remaining there approximately ten minutes. While defendant did say hello to Roma, there was no conversation about going to the farmhouse to see a new car.

Defendant then proceeded to the Jaycee circus office (of which project he was chairman or chairperson) where he remained from 1:00 p. m. through 4:00 p. m. He then picked up his wife, had dinner and returned her to work at around 5:00.

Mr. Robert Shenafelt was also at the circus office April 5. Defendant claimed he purchased handcuffs from Shenafelt that afternoon. In this regard, the State had earlier called Shenafelt as a witness. His testimony differed significantly from defendant's. While it may have been earlier, Shenafelt thought it was around 3:00 when defendant came into the office and stayed only a short period. As to the handcuffs, Shenafelt thought defendant purchased the handcuffs April 3—it seemed like it was in the middle of the week. Upon cross-examination, Shenafelt could state for sure only that the purchase took place some time during the week.

Finally, the defense called Mr. Max Marlin, owner of the farm, to the stand. Marlin testified he was at the farm from 12:00 through 4:00 p. m., April 5 and saw no one. This testimony was contradicted by state rebuttal witness Wayne Sheston, an agent of the Bureau of Criminal Investigation, who stated Marlin told him he had spent the entire day of April 5 in Ottumwa.

The jury returned a verdict of guilty. Sentencing was set for October 28, 1974, and a presentence investigation was ordered. Included in the information before Judge Pettit was a letter from Doctor Paul L. Loeffelholz, Clinical Director of the Iowa Security Medical Facility at Oakdale. Defendant had been sent to Oakdale pursuant to a chapter 225A order for determination whether defendant was a sexual psychopath. This letter stated defendant "does not have a psychiatric condition which requires any hospitalization in a psychiatric setting." Also contained in the letter, however, is the following statement:

"The patient claims that he cannot understand why the charges were finally placed, but since that time other women in the community have alleged that Mr. Pilcher perpetrated indiscreet sexual behavior in relation to them. The patient denies such activity. This man also understands that he is considered as a suspect in an unsolved murder which happened in Wapello County. Mr. Pilcher says that he had nothing to do with that event but at the same time, he says he can understand why he is considered as a possible suspect."

The presentence report itself mentions the above sexual behavior and Dr. Loeffelholz' conclusion defendant does not suffer from a psychiatric condition requiring hospitalization. Judge Pettit considered this information in denying a bench probation even though the section 225A.8 proceeding had been dismissed due to the doctor's conclusion.

At the close of the State's evidence defendant had filed a motion to dismiss based upon the reasons urged in the demurrer. The trial court overruled the motion. This was followed by a motion for a directed verdict, alleging failure of proof (1) of the elements constituting the crime of sodomy, (2) that defendant had any type of carnal copulation with the complaining witness, (3) that any carnal copulation occurred in any opening of the body other than sexual parts—the definition of sexual parts including the mouth, and (4) that the offense occurred in Wapello County. Defendant further urged the evidence showed Roma Waterhouse was a willing participant and therefore an accomplice. Thus, there was a failure of proof in that no corroborating evidence was adduced the act did actually occur or that defendant was the perpetrator. Finally, it was asserted if the case were to go to the jury, it would allow speculation on the part of the jury constituting a denial of defendant's rights to a fair trial and due process of law. Both motions were overruled.

At the close of all evidence, defendant renewed his motions for dismissal and for a directed verdict as well as the above grounds therefor. To the motion for a directed verdict was added the ground the State had failed to establish each element of the crime beyond a reasonable doubt. These motions too were overruled.

Finally, before argument to the jury, defendant excepted to instructions 6 and 7. Instruction 6 defined sodomy, and the objection raised the demurrer's grounds as well as the fact "sexual parts" was not defined. Instruction 7, paragraph two, was objected to based upon the fact the mouth is a sexual part. There is no indication of record of further objections to the instructions at any time.

After rendition of judgment and sentence, defendant appealed to this court.

I. Defendant contends the trial court erred in overruling his demurrer and motion to dismiss directed at the constitutionality of sections 705.1 and 705.2. These statutes provide in pertinent part:

"705.1 Definition. Whoever shall have carnal copulation in any opening of the body except sexual parts, with another human being, * * *, shall be deemed guilty of sodomy.

"705.2 Punishment. Any person who shall commit sodomy, shall be imprisoned in the penitentiary not more that ten years."

Defendant's attack upon constitutionality is predicated on the following grounds: (1) it is an invalid exercise of the State's police power in that it serves "no real, substantial and rational relationship to the public safety, morals, or general welfare"; (2) chapter 705 violates due process and equal protection; (3) it is void for vagueness; (4) it imposes cruel and unusual punishment; and (5) it invades constitutionally protected areas.

Defendant's attack upon the constitutionality of these statutes is based on the assumption the facts occurred as described by Roma Waterhouse although as a witness defendant denied involvement in the case. Viewed in this light Pilcher is charged with having committed, in privacy, carnal copulation per os with an adult person of the opposite sex, not his spouse.

Pilcher first points out section 705.1 makes all sodomy illegal, whether between persons married or unmarried, between consenting or nonconsenting adults or between the same or opposite sexes. It draws no distinction between public and private acts. Likewise, the age of the parties is not relevant. However, he specifically states he is not asking the court to consider homosexual activity or carnal copulation per anum.

At the outset, this court employs several well settled principles in dealing with questions of a statute's constitutionality:

"It is well settled regularly enacted statutes are accorded a strong presumption of constitutionality. * * * [citing authorities].

"Then too, where the constitutionality of a statute is merely doubtful, this court will not interfere. * * * [citing authorities].

"And legislative enactments will not be held unconstitutional unless they are shown to clearly, palpably and without doubt infringe upon constitutional rights. * * * [citing authorities].

"Finally, a party attacking any statutory enactment must negate every reasonable basis of support for such statute. * * * [citing authorities]." *State v. Kueny,* 215 N.W.2d 215, 216–217 (Iowa 1974). See also *State v. Aldrich,* 231 N.W.2d 890, 894 (Iowa 1975).

Likewise, the rules pertaining to vagueness and overbreadth are well established:

" * * * A statute is void under the Due Process Clause if it 'either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application * * *.' *Connally v. General Construction Co:,* 269 U.S. 385, 391, 46 S.Ct. 126, 127, 70 L.Ed. 322, 328 (1926). A penal statute must give a person of ordinary intelligence fair warning of what is prohibited, and, in order to avoid arbitrary and discriminatory enforcement, it must provide an explicit standard for those who apply it. *Grayned v. City of Rockford,* 408 U.S. 104, 108–109, 92 S.Ct. 2294, 2298–2299, 33 L.Ed.2d 222, 227 (1972); *State v. Robinson,* 183 N.W.2d 190, 193 (Iowa 1971)." *State v. Willis,* 218 N.W.2d 921, 923 (Iowa 1974).

"It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined. Vague laws offend several important values. First, because we assume that man is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly. Vague laws may trap the innocent by not providing fair warning. Second, if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them. A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an *ad hoc* and subjective basis, with the attendant dangers of arbitrary and discriminatory application. Third, but related, where a vague statute 'abut[s] upon sensitive areas of basic First Amendment freedoms,' it 'operates to inhibit the exercise of [those] freedoms.' Uncertain meanings inevitably lead citizens to ' "steer far wider of the unlawful zone" * * * than if the boundaries of the forbidden areas were clearly marked.' " *Grayned v. City of Rockford,* 408 U.S. 104, 108–109, 92 S.Ct. 2294, 2298–2299, 33 L.Ed.2d 222, 227–228; *State v. Kueny,* supra, 215 N.W.2d at 217.

*State v. Williams,* 171 N.W.2d 521, 527 (Iowa 1969), cert. den., 398 U.S. 937, 90 S.Ct. 1837, 26 L.Ed.2d 268, has this statement:

"However, a statute is not so vague and uncertain as to be void where the meaning of words used can be fairly ascertained by reference to similar statutes, other judicial determinations, reference to the common law, to the dictionary, or if the words themselves have a common and generally accepted meaning. * * * [citing authority]." See also *State v. Kueny,* 215 N.W.2d at 217 and *State v. Aldrich,* 231 N.W.2d at 894.

■ Overbreadth, while closely related to vagueness, is nevertheless a separate constitutional concept. "A statute is overbroad if it attempts to achieve a governmental purpose to control or prevent activities constitutionally subject to state regulation by means which sweep unnecessarily broadly and thereby invade the area of protected freedoms. * * * [citing authorities]." *State v. Willis,* supra, 218 N.W.2d at 923.

Along this same line *State v. Wedelstedt,* 213 N.W.2d 652, 656 (Iowa 1973), has this statement:

"Vagueness and overbreadth are two separate matters although closely related. In

*Zwickler v. Koota,* 389 U.S. 241, 249–250, 88 S.Ct. 391, 396, 19 L.Ed.2d 444, 451, the court distinguishes one from the other:

" ' * * * Appellant's challenge is not that the statute is void for "vagueness," that is, that it is a statute "which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application * * * ." *Connally v. General Construction Co.,* 269 U.S. 385, 391, 46 S.Ct. 126, 70 L.Ed. 322, 328. Rather his constitutional attack is that the statute, although lacking neither clarity nor precision, is void for "overbreadth," that is, that it offends the constitutional principle that "a governmental purpose to control or prevent activities constitutionally subject to state regulation may not be achieved by means which sweep unnecessarily broadly and thereby invade the area of protected freedoms. * * * ." ' "

■ However, we point out when the first amendment becomes involved in a controversy, the concepts of vagueness and overbreadth become intertwined. A reading of the discussion in *Broadrick v. Oklahoma,* 413 U.S. 601, 93 S.Ct. 2908, 37 L.Ed.2d 830, illustrates this conceptual blending. Such a "merger" of theories is logical. As pointed out in the quotation from *Grayned,* 408 U.S. at 109, 92 S.Ct. at 2299, 33 L.Ed.2d at 228, *uncertain* (vague) meanings in a statute may lead citizens to steer far wider of the unlawful zone than if the forbidden areas were clearly marked. Expressed differently, a law which is vague may "chill" the valid exercise of constitutional rights. In this sense, the vagueness of the statute gives rise to its overbreadth; the concepts, in this situation, would merge.

II. The State insists defendant does not have standing to challenge the constitutionality of section 705.1 on the theory this statute violates the right of privacy of married persons and consenting adults to engage in sodomitical conduct involving oral copulation since defendant was neither married to Roma Waterhouse nor did he have her consent.

In support of this contention the State relies on this statement of principle:

" * * * [O]ne to whom application of a statute is constitutional will not be heard to attack the statute on the ground that impliedly it might also be taken as applying to other persons or to other situations in which its application might be unconstitutional. * * * [citing authorities]." *United States v. Raines,* 362 U.S. 17, 21, 80 S.Ct. 519, 522, 4 L.Ed.2d 524. See also *State v. Willis,* 218 N.W.2d at 923.

■ Section 705.1 does not require the act be forced. Expressed differently, consenting sodomitical acts are presumably prohibited the same as are nonconsenting ones.

The court in instruction 8 told the jury:

"If two persons voluntarily and willingly participate in an act of sodomy, each is regarded in law as an accomplice, as well as a principal.

"It is your duty to determine from the evidence whether Roma Charlyn Waterhouse, with whom defendant is alleged to have committed the crime of sodomy, was a voluntary and willing participant therein.

"If you so find, you are instructed that defendant cannot be convicted of the crime charged upon her testimony alone, unless it is corroborated by other evidence tending to show not only that the crime of sodomy was committed, but that it was committed by the defendant.

"But if you find that Roma Charlyn Waterhouse was not a voluntary and willing participant in the act of sodomy, if any you find, then she would not be an accomplice and her testimony need not be corroborated as set forth in this instruction."

The jury found defendant "guilty of the crime of sodomy." There were no special interrogatories concerning the issue of consent. Hence, it is impossible to ascertain whether the jury convicted defendant of forced sodomy or sodomy with consent, even though the evidence there was consent was not strong. If governmental prohibition of both is constitutional there is obviously no problem. However, if private con-

sensual acts of sodomy between adult partners of the opposite sex not married to each other is protected from governmental prohibition, then this court could be inserted into guessing the type of sodomy for which defendant was convicted.

Prediction of this sort has been condemned at least since the Supreme Court handed down *Stromberg v. California,* 283 U.S. 359, 51 S.Ct. 532, 75 L.Ed. 1117, 73 A.L.R. 1484, where a statute rendered it a public offense to display a red flag for any one of three purposes: (1) as a sign, symbol or emblem of opposition to organized government; (2) as an invitation to anarchistic action; or (3) as an aid to propaganda of a seditious character. The state appellate court questioned the constitutionality of the first purpose but sustained the conviction since it could have rested on either of the other two purposes. The Supreme Court stated:

"We are unable to agree with this disposition of the case. The verdict against the appellant was a general one. It did not specify the ground upon which it rested. As there were three purposes set forth in the statute, and the jury was instructed that their verdict might be given with respect to any one of them, independently considered, it is impossible to say under which clause of the statute the conviction was obtained. If any one of these clauses, which the state court has held to be separable, was invalid, it cannot be determined upon this record that the appellant was not convicted under that clause. It may be added that this is far from being a merely academic proposition, as it appears, upon an examination of the original record filed with this Court, that the State's attorney upon the trial emphatically urged upon the jury that they could convict the appellant under the first clause alone, without regard to the other clauses. * * * [T]he necessary conclusion from the manner in which the case was sent to the jury is that, if any of the clauses in question is invalid under the Federal Constitution, the conviction cannot be upheld.

"We are thus brought to the question whether any one of the three clauses, as construed by the state court, is upon its face repugnant to the Federal Constitution so that it could not constitute a lawful foundation for a criminal prosecution. * * *." 283 U.S. at 367–368, 51 S.Ct. at 535, 75 L.Ed. at 1122, 73 A.L.R. at 1489.

The *Stromberg* Court then determined the first clause was invalid on its face. Since conviction may have rested exclusively upon the constitutionally repugnant clause, the verdict was set aside.

In *Street v. New York,* 394 U.S. 576, 89 S.Ct. 1354, 22 L.Ed.2d 572, a flag desecration case, defendant may have been convicted solely upon constitutionally protected words. The Court noted:

"The principle established in *Stromberg* has been consistently followed. In *Williams v. North Carolina,* 317 U.S. 287, 63 S.Ct. 207, 87 L.Ed. 279 (1942), this Court again held itself compelled to reverse a conviction based upon a general jury verdict when the record failed to prove that the conviction was not founded upon a theory which could not constitutionally support a verdict. The Court stated:

" 'To say that a general verdict of guilty should be upheld though we cannot know that it did not rest on the invalid constitutional ground * * * would be to countenance a procedure which would cause a serious impairment of constitutional rights.' *Id.,* at 292, 63 S.Ct. at 210.

"The rule was again applied in *Cramer v. United States,* 325 U.S. 1, 36, n. 45, 65 S.Ct. 918, 935, 89 L.Ed. 1441 (1945); *Terminiello v. City of Chicago,* 337 U.S. 1, 5–6, 69 S.Ct. 894, 896, 93 L.Ed. 1131 (1949); and *Yates v. United States,* 354 U.S. 298, 311, 77 S.Ct. 1064, 1072, 1 L.Ed.2d 1356 (1957)." 394 U.S. at 586, 89 S.Ct. at 1362, 22 L.Ed.2d at 581.

" * * * Hence, we conclude that the case is governed by the rule of *Stromberg,* and that appellant's conviction must be set aside if we find that it could have been based solely upon his words and that a conviction resting on such a basis would be

unconstitutional—a matter to which we shall turn in a moment.

"Moreover, even assuming that the record precludes the inference that appellant's conviction might have been based *solely* on his words, we are still bound to reverse if the conviction could have been based upon *both* his words and his act." 394 U.S. at 586–587, 89 S.Ct. at 1363, 22 L.Ed.2d at 582. (Emphasis in the original).

The foregoing propositions of law find further support in the following United States Supreme Court decisions: *New York Times Company v. Sullivan*, 376 U.S. 254, 283–284, 84 S.Ct. 710, 727–728, 11 L.Ed.2d 686, 95 A.L.R.2d 1412; *Leary v. United States*, 395 U.S. 6, 31–32, 89 S.Ct. 1532, 1545–1546, 23 L.Ed.2d 57; *Bachellar v. Maryland*, 397 U.S. 564, 570–571, 90 S.Ct. 1312, 1315–1316, 25 L.Ed.2d 570; *Schacht v. United States*, 398 U.S. 58, 70, 90 S.Ct. 1555, 1562–1563, 26 L.Ed.2d 44 (White, concurring in result); and *Eaton v. City of Tulsa*, 415 U.S. 697, 699, 94 S.Ct. 1228, 1230, 39 L.Ed.2d 693.

The Third Circuit Court of Appeals has aptly stated:

" * * * As we have no way of knowing which alternative instruction the jury selected or followed in its determination of appellant's guilt, we are required to review the validity of both aspects of the charge. If *either* ground is invalid, the conviction must be reversed: * * * [citing authorities]." *United States v. Bowen*, 414 F.2d 1268, 1272–1273 (3 Cir. 1969). (Emphasis in the original).

Examination of the record reveals the testimony was conflicting. Defendant maintained and continues to maintain Roma consented (while, at the same time, denying the act took place). Roma claimed otherwise. It is clear the act took place in private. However, as stated, there is no means by which this court could conclude as a matter of law whether or not this sodomy was between consenting adults.

■ We deem it impossible to say whether the general verdict of "guilty of the crime of sodomy" returned by the jury was based on a finding of a sodomical act committed in private with an adult person of the opposite sex who was not defendant's spouse or if the verdict rested on the finding the oral copulation with Mrs. Waterhouse was accomplished by force and violence exerted by defendant.

We conclude defendant has standing to question the constitutionality of the sodomy statute as it applies to the private, consensual acts of adult persons of the opposite sex not married to each other as an invasion of personal rights.

We do not understand defendant to question the power of a state to constitutionally regulate sexual activity involving adult corruption of minors or forceful nonconsenting sexual behavior between adults and to render criminal such sexual activities.

It has been concluded a defendant convicted of forced or public sodomy does not have standing to assert the rights of married or unmarried consenting adults to engage in such private sexual activities. See *Carter v. State*, 255 Ark. 225, 500 S.W.2d 368, 373, cert. den., 416 U.S. 905, 94 S.Ct. 1610, 40 L.Ed.2d 110; *People v. Sharpe*, 183 Colo. 64, 514 P.2d 1138, 1140–1141 (1973); *Hughes v. State*, 14 Md.App. 497, 287 A.2d 299, 303–304, cert. den., 409 U.S. 1025, 93 S.Ct. 469, 34 L.Ed.2d 317; *Jones v. State*, 85 Nev. 411, 456 P.2d 429, 430–431; *Byrd v. State*, 65 Wis.2d 415, 222 N.W.2d 696, 699–700; *United States v. Brewer*, 363 F.Supp. 606, 607 (M.D.Pa.1973) (Brewer denied standing to prisoners to assert the rights of consenting adults); *Lovisi v. Slayton*, 363 F.Supp. 620, 624 (E.D.Va., Richmond Division 1973); and *Swikert v. Cady*, 381 F.Supp. 988, 989 (E.D.Wis.1974).

III. The main and most compelling thrust of any argument against a sodomy statute's constitutionality entails assertion that the emerging right of privacy protects private sexual activity between consenting adults of the opposite sex not married to each other. The general right of privacy " * * * has been viewed as emanating from the first amendment's guarantee of freedom of association, *NAACP v. Alabama*, 357 U.S. 449, 78 S.Ct. 1163, 2

L.Ed.2d 1488 (1958); and of speech, *Stanley v. Georgia,* 394 U.S. 557, 89 S.Ct. 1243, 22 L.Ed.2d 542 (1969); the fourth amendment, *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); the equal protection clause of the fourteenth amendment, *Loving v. Virginia,* 388 U.S. 1, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967); the ninth amendment, *Griswold v. Connecticut,* 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965) (Goldberg, J., concurring); the penumbras of the Bill of Rights, id.; and the concept of liberty guaranteed by the due process clause of the fourteenth amendment, *Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973). The Court is satisfied that the candid approach of *Roe v. Wade,* supra, and of Mr. Justice Harlan's concurrence in *Griswold v. Connecticut,* supra, 381 U.S. at 499, 85 S.Ct. 1678, that the due process clause of the fourteenth amendment provides substantive protection for fundamental human values 'implicit in the concept of ordered liberty,' *Palko v. Connecticut,* 302 U.S. 319, 325, 58 S.Ct. 149, 152, 82 L.Ed. 288 (1937), represents the preferred view. * * *." *Lovisi v. Slayton,* supra, 363 F.Supp. 620, 624.

The Supreme Court has recognized the right to privacy as it applies to sexual relations. Thus, in *Griswold v. Connecticut,* supra, a statute prohibiting the use and distribution of contraceptives was struck down on the basis it operated " * * * directly on an intimate relation of husband and wife and their physician's role in one aspect of that relation." 381 U.S. at 482, 85 S.Ct. at 1680, 14 L.Ed.2d at 513.

Mr. Justice Douglas asked, " * * * Would we allow the police to search the sacred precincts of marital bedrooms for telltale signs of the use of contraceptives? The very idea is repulsive to the notions of privacy surrounding the marriage relationship.

"We deal with a right of privacy older than the Bill of Rights—older than our political parties, older than our school system. Marriage is a coming together for better or for worse, hopefully enduring, and intimate to the degree of being sacred.

* * *." 381 U.S. at 485–486, 85 S.Ct. at 1682, 14 L.Ed.2d at 516.

Several decisions have interpreted *Griswold* as denying the state the right to regulate private marital relations.

" * * * The import of the *Griswold* decision is that private, consensual, marital relations are protected from regulation by the state through the use of a criminal penalty." *Cotner v. Henry,* 394 F.2d 873, 875 (7 Cir. 1968), cert. den., 393 U.S. 847, 89 S.Ct. 132, 21 L.Ed.2d 118.

Worthy of noting is the comment in note 3, page 875 of *Cotner* that "[t]he American Law Institute Model Penal Code adopts the view that consensual private sexual conduct between adults should not ordinarily be subject to criminal sanction."

*Buchanan v. Batchelor,* 308 F.Supp. 729, 732–733 (N.D.Tex.1970), has this statement:

"In *Travers v. Paton,* D.C.Conn., 261 F.Supp. 110, 113 (1966), the opinion observes that *Griswold* protects 'the sanctity of sexual aspects of the marital relationship,' but holds that *Griswold* is applicable only within the marital context. *Smayda v. United States,* 9 Cir., 352 F.2d 251, 255–257 (1965), also restricts the application of *Griswold,* holding that homosexuals committing acts of sodomy in a public rest-room are not protected by that decision." This opinion was vacated on different grounds in *Wade v. Buchanan,* 401 U.S. 989, 91 S.Ct. 1221, 28 L.Ed.2d 526 (1971) and 401 U.S. 989, 91 S.Ct. 1222, 28 L.Ed.2d 526 (1971). The district court had enjoined enforcement of the sodomy statute, and the Supreme Court vacated with reference to *Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971) and *Samuels v. Mackell,* 401 U.S. 66, 91 S.Ct. 764, 27 L.Ed.2d 688 (1971), which forbid federal courts to stay or enjoin, or achieve that effect through declaratory judgment, pending state court proceedings. It would therefore seem the reasoning concerning sodomy is capable of reliance.

The *Buchanan* court recognized a state's power to regulate "sexual promiscuity or misconduct", but agreed with *Griswold* such "regulation may not be achieved by means

which sweep unnecessarily broadly and thereby invade the area of protected freedoms." (*Griswold*, 381 U.S. at 485, 85 S.Ct. at 1682, quoting from *NAACP v. Alabama*, 377 U.S. 288, 307, 84 S.Ct. 1302, 1314, 12 L.Ed.2d 325 (1964)). 308 F.Supp. at 733.

It was then determined that while the act of sodomy is not approved by the majority of the population, " * * * such opinion is not sufficient reason for the State to encroach upon the liberty of married persons in their private conduct. Absent some demonstrable necessity, matters of (good or bad) taste are to be protected from regulation. * * * [citing authorities]." 308 F.Supp. at 733.

In its findings of law, the district court concluded the statute swept into the area of "fundamental liberties, such as the private acts of * * * [the married couple]." 308 F.Supp. at 736.

The next step taken in this area is that the State may not interfere with the private sexual actions of consenting adults of the opposite sex not married to each other. This reasoning has often found its basis in *Eisenstadt v. Baird*, 405 U.S. 438, 92 S.Ct. 1029, 31 L.Ed.2d 349, a case which held the different treatment accorded married and unmarried persons as to the availability of contraceptives was not grounded on a rational difference. Thus, the statute violated equal protection. The Court, through Justice Brennan, reasoned this was so under either of two situations: (1) If under *Griswold* the distribution of contraceptives to married persons could not be prohibited due to the right of privacy, then such right would inhere equally to *individuals*; (2) If *Griswold* does not bar the state's prohibition on the distribution of contraceptives, the state could not allow married persons such a right but deny it to unmarried individuals. 405 U.S. at 453–454, 92 S.Ct. at 1038, 31 L.Ed.2d at 362.

The *Eisenstadt* court further stated: " * * * It is true that in *Griswold* the right of privacy in question inhered in the marital relationship. Yet the marital couple is not an independent entity with a mind and heart of its own, but an association of two individuals each with a separate intellectual and emotional makeup. * * * [citing authorities]." 405 U.S. at 453, 92 S.Ct. at 1038, 31 L.Ed.2d at 362.

■ Thus, it may be said the Equal Protection Clause insures one's right to privacy in the individual sense. Governmental intrusion into "fundamental matters" cannot be distinguished on the basis of marital status.

At another point in *Lovisi v. Slayton*, 363 F.Supp. at 625–626, we find this discussion:

"The phrase 'right to privacy' may, unless carefully defined, be misconstrued. This is because privacy can refer either to seclusion or to that which is personal. To describe an act as private may mean that it is performed behind closed doors. It may also mean that the doing of that act is a decision personal to the one performing it and having no effect on others. In the constitutional context, the meaning of privacy is doubtless closer to the latter than the former definition. This does not mean, however, that the United States Constitution guarantees to an individual the right to perform any act which he may choose to do so long as the performance of that act has no meaningful effect on others. Rather, the right to privacy extends to the performance of personal acts or decisions only within certain contexts. * * * [citing authorities]."

■ In *Lovisi v. Slayton*, 363 F.Supp. at 624, it is noted that, "Despite the philosophical differences of the majority in *Griswold v. Connecticut*, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965), as to which constitutional provision encompasses the right to privacy, their agreement was complete as to the sanctity of the marital relationship." We are convinced in light of the decisions considered herein and the authorities cited in those opinions that the right of privacy extends to sexual relations between husband and wife. Consequently, if sections 705.1 and 705.2 are applied to sexual acts committed in private between consenting married couples, the statutes are unconstitutional.

■ In our opinion, the rationale expressed in *Eisenstadt* extends to protect the manner of sexual relations performed in private between consenting adults of the opposite sex not married to each other.

■ Before the state can encroach into recognized areas of fundamental rights, such as the personal right of privacy, there must exist a subordinating interest which is compelling and necessary, not merely related, to the accomplishment of a permissible state policy. *Griswold v. Connecticut*, 381 U.S. at 497–498, 85 S.Ct. at 1688–1689, 14 L.Ed.2d at 522, 523 (Goldberg, J., concurring). The State has not shown the existence of any such interest here.

■ Defense counsel has referred the court to numerous publications which might be adequately described as "sex manuals." As suggested in *Carter v. State*, 255 Ark. at 228, 500 S.W.2d at 371, we do not deem these publications to be of such compelling force or effect that we may take judicial notice of the supposed data, arguments and recommendation of the authors (even though they may have been bestsellers). These publications have no place in a quest involving determination of the constitutional validity of a criminal statute. We have not considered this material in reaching our decision.

■ We hold section 705.1 in its present form is unconstitutional as an invasion of fundamental rights, such as the personal right of privacy, to the extent it attempts to regulate through use of criminal penalty consensual sodomitical practices performed in private by adult persons of the opposite sex.

It is unnecessary to consider the other grounds urged by defendant in his attack on the constitutionality of these statutes. For the same reason, we do not reach other contentions asserted by defendant as grounds for reversal.

We point out what should be obvious that in reaching the foregoing decision we are dealing with section 705.1 as presently in force and in no way touch the power of the legislature to enact statutes which otherwise pass constitutional muster providing for regulation rendering criminal sexual acts of any nature in public, bestiality, adult corruption of children or forcible nonconsenting sexual behavior between adults. We do not reach the question of homosexuality since the applicability of the statute to such conduct was not made an issue in this case.

The question remains whether this court should direct defendant be discharged and his bail exonerated or whether a new trial should be ordered on remand under the provisions of section 793.21, The Code.

The pertinent provisions of section 705.1 have been set out in this opinion. As stated, it makes all sodomy illegal, whether between persons married or unmarried, between consenting or nonconsenting adults or between the same or opposite sexes. It draws no distinction between public and private acts. Likewise, the age of the parties is not relevant.

We recognize that " * * * courts should construe statutes to avoid unconstitutionality if they reasonably can. *Kruck v. Needles*, 259 Iowa 470, 144 N.W.2d 296." *State v. Lavin*, 204 N.W.2d 844, 849 (Iowa 1973).

■ The problem presented by this statute is not one which may be solved by application of the doctrine of separability which was discussed at length in *State v. Blyth*, 226 N.W.2d 250, 261–263 (Iowa 1975). There is no word, clause or phrase which may be excised from this section which will render it constitutionally acceptable and still leave standing a statute capable of fulfilling the legislative intent in enacting the statute. To be constitutionally valid under this decision section 705.1 would have to be construed as excluding from its prohibition private consensual sodomitical conduct of adult persons of the opposite sex.

The problem with this latter approach is what words in the statute lend themselves to such construction. Any such attempt would require this court to judicially supply what has been legislatively omitted.

*State v. Monroe,* 236 N.W.2d 24, 36 (Iowa 1975), admonishes us about such practice in this language:

"Furthermore, such action would, in effect, be an impermissible enlargement of § 204.401. A court may not, under the guise of construction, extend or enlarge the terms of a statute. *City of Cedar Rapids v. Moses,* 223 N.W.2d 263, 268 (Iowa 1974); *State v. Wedelstedt,* * * * 213 N.W.2d [652] at 656. To extend the scope of an Act's operation by invalidating a provision of limitation while allowing the remainder to continue in effect is to invite criticism that it amounts to judicial legislation. See 2 Sutherland Statutory Construction, * * [Sands Fourth Ed. 1973] § 44.13, page 359."

■ The statute cannot be construed to render it constitutionally valid when applied to the factual situation presented by this record.

We therefore hold the statute cannot constitutionally be applied to alleged sodomitical acts performed in private between consenting adults of the opposite sex. We do not intimate any view of the constitutionality of the statute as applied in any other factual situation.

The case is—Reversed but not remanded.

RAWLINGS, REES, HARRIS and McCORMICK, JJ., concur.

REYNOLDSON, J., MOORE, C. J., Le-GRAND and UHLENHOPP, JJ., dissent.

REYNOLDSON, Justice (dissenting).

I respectfully dissent in what has been a very troublesome appeal.

Viewing the evidence in the light most favorable to defendant, we have the case of a man and woman, each married to another, consensually engaging in an act of fellatio in a third person's house. The majority finds this conduct protected by a "right of privacy" grounded on the due process clause of the United States Constitution, Amendment 14, which "provides substantive protection for fundamental human values 'implicit in the concept of ordered liberty.'"

Holding the United States Constitution forbids state regulation of such consensual acts in absence of a compelling reason, the majority, displaying an understandable ambivalence by indicating it holds the statute unconstitutional only as applied, nonetheless clearly strikes down § 705.1, The Code (sodomy) *in toto.* In so doing, it ignores the action of the United States Supreme Court, which upheld the constitutionality of a similar Virginia sodomy statute (see *Doe v. Commonwealth's Atty. for City of Richmond,* 403 F.Supp. 1199 [E.D.Va.1975], aff'd, —— U.S. ——, 96 S.Ct. 1489, 47 L.Ed.2d 751, 44 U.S.L.W. 3545 [1976]). It also ignores the latest decision from a state supreme court, *State v. Bateman,* 113 Ariz. 107, 547 P.2d 6 (1976), to pursue a rationale which no other court of last resort in any jurisdiction has adopted.

The majority employs a United States Supreme Court decision grounded on the sanctity of the marriage relationship (*Griswold v. Connecticut,* 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 [1965]) and another grounded on the personal choice of procreation (*Eisenstadt v. Baird,* 405 U.S. 438, 92 S.Ct. 1029, 31 L.Ed.2d 349 [1972]) in pioneering an unqualified and absolute right of privacy which protects an act of fellatio between two persons, each married to another, to the extent of rendering a proscribing Iowa statute unconstitutional. Such a result should be reached only after the most careful analysis to determine whether it is mandated.

I. *What is the effect of the majority holding?*

The ambivalence of the majority opinion, above noted, is best demonstrated by comparing this sentence: "The statute cannot be construed to render it constitutionally valid when applied to the factual situation presented by this record," with the language quoted below. Nothing can disguise the fact, however, § 705.1 has been declared unconstitutional on its face, nor will the bench and bar interpret this decision in any other way. Although superficially appearing to reserve all those other troublesome situations which now will soon clog our

appeals pipeline (e. g., homosexual acts, sodomitical acts with minors, nonconsenting sodomitical acts) there is no mistaking the majority's sweeping indictment of § 705.1:

> "[I]t [§ 705.1] makes all sodomy illegal, whether between persons married or unmarried, between consenting or nonconsenting adults or between the same or opposite sexes. It draws no distinction between public and private acts. Likewise, the age of the parties is not relevant.

\*　　\*　　\*　　\*　　\*　　\*

> There is no word, clause or phrase which may be excised from this section which will render it constitutionally acceptable and still leave standing a statute capable of fulfilling the legislative intent in enacting the statute."

Of course, under this restrictive rationale, there are also no words which may be excised to make it applicable to future cases involving persons of the same sex, or nonconsenting persons or adult-minor or public sexual activities. The language of the majority above quoted and earlier portions of the opinion can only be interpreted to mean: (1) the statute as written is overly broad because it encompasses constitutionally protected activities; (2) this court is powerless to restrict the scope of the statute; (3) therefore § 705.1 is unconstitutional on its face. Given this hypothesis, well-established principles inexorably dictate the statute is void. See *Dombrowski v. Pfister*, 308 U.S. 479, 497, 85 S.Ct. 1116, 1126, 14 L.Ed.2d 22, 34 (1965); 1 Sutherland Statutory Construction § 2.06 at 22 (Sands 4th ed. 1972).

If, as the majority elsewhere in its opinion desultorily intimates, it intends to hold the statute unconstitutional only as to consenting adults of the opposite sex then it should: (1) say so, and (2) remand the case for retrial under appropriate instructions. This was the disposition made by the United States Supreme Court in each case cited by the majority where defendant's conviction encompassed activities which, depending on a jury's factual finding, may have fallen either in a constitutionally protected or a constitutionally unprotected area. See *Bachellar v. Maryland*, 397 U.S. 564, 90 S.Ct. 1312, 25 L.Ed.2d 570 (1970); *Street v. New York*, 394 U.S. 576, 89 S.Ct. 1354, 22 L.Ed.2d 572 (1969); *Williams v. North Carolina*, 317 U.S. 287, 63 S.Ct. 207, 87 L.Ed. 279 (1942); *Stromberg v. California*, 283 U.S. 359, 51 S.Ct. 532, 75 L.Ed. 1117 (1931); *United States v. Bowen*, 414 F.2d 1268 (3 Cir. 1969).

That majority fails to remand is further proof it strikes down § 705.1 *in toto*. If the statute is unconstitutional only as to consenting adults of the opposite sex, then it should be a simple matter to allow the jury to find whether that is the fact situation presented in this case. On the other hand, under the majority's rationale, if there are no words to strike which would permit the jury to distinguish between a consenting and nonconsenting situation, then there are none to strike which would permit a jury to distinguish between male and female or adult and minor. It is clear the majority's approach drains all viability from § 705.1.

Another fall-out from today's invalidation of § 705.1 will be a multitude of challenges by those previously convicted of a § 705.1 crime, asserting this decision must be given retroactive application. At the minimum, the majority should limit the havoc its opinion will create by declaring it applies prospectively only.

We turn now to a discussion of the arguments raised here by the defendant, some of which the majority unfortunately adopts.

II. *Is § 705.1, The Code, void for vagueness?*

Defendant contends the language of the statute so vaguely defines sodomitical conduct it is constitutionally unenforceable. But our adjudicated cases have defined and brought within the statute's scope the identical act defendant was accused of committing. *State v. Simpson*, 243 Iowa 65, 50 N.W.2d 601 (1951); *State v. Farris*, 189 Iowa 505, 178 N.W. 361 (1920).

The majority appropriately has cited to our rule that a statute is not so vague and

uncertain as to be void where the meaning of the words can be ascertained by reference to other judicial determinations. *State v. Williams,* 238 N.W.2d 302, 307 (Iowa 1976). Fleshed out by our adjudicated cases, supra, § 705.1 is not unconstitutionally vague in any manner affecting the defendant in this appeal.

Nor are we concerned with the vagueness-overbreadth intertwining referred to by the majority, which may find applicability in cases involving the first amendment. The privacy right which defendant claims should insulate him from prosecution is rooted in the fourteenth amendment, as indicated by majority in division III of its opinion. See *Roe v. Wade,* 410 U.S. 113, 153, 93 S.Ct. 705, 727, 35 L.Ed.2d 147, 177 (1973); *State v. Price,* 237 N.W.2d 813, 817 (Iowa 1976).

Almost-identical statutes have withstood void-for-vagueness constitutional attacks. *Rose v. Locke,* 423 U.S. 48, 96 S.Ct. 243, 46 L.Ed.2d 185 (1975); *Wainwright v. Stone,* 414 U.S. 21, 94 S.Ct. 190, 38 L.Ed.2d 179 (1973); *Carter v. State,* 255 Ark. 225, 232, 500 S.W.2d 368, 373 (1973), cert. denied, 416 U.S. 905, 94 S.Ct. 1610, 40 L.Ed.2d 110 (1974); *Dixon v. State,* 256 Ind. 266, 271–272, 268 N.E.2d 84, 86–87 (1971).

Defendant's void-for-vagueness arguments are without merit.

### III. *Is § 705.1 unconstitutionally overbroad?*

While there is considerable question whether defendant challenges § 705.1 for overbreadth, at one point in his brief he does assert, "[t]here can be no justification for the overbreadth of this statute which attempts to regulate the sexual practices of husband and wife."

A statute is overbroad if it attempts to achieve a governmental purpose to control or prevent activities constitutionally subject to state regulation by means which sweep unnecessarily into areas of protected freedoms. *Zwickler v. Koota,* 389 U.S. 241 249–250, 88 S.Ct. 391, 396, 19 L.Ed.2d 444, 451 (1967); *State v. Willis,* 218 N.W.2d 921, 923 (Iowa 1974).

Of course defendant initially must show he has standing to question the statute's constitutionality on this ground. Ordinarily a person to whom a statute may constitutionally be applied will not be heard to challenge that statute on the ground it may conceivably be applied unconstitutionally to others. *Broadrick v. Oklahoma,* 413 U.S. 601, 610–611, 93 S.Ct. 2908, 2915, 37 L.Ed.2d 830, 839 (1973); *Carter v. State,* supra, 255 Ark. at 233, 500 S.W.2d at 373; *Hughes v. State,* 14 Md.App. 497, 501, 287 A.2d 299, 303, cert. denied, 409 U.S. 1025, 93 S.Ct. 469, 34 L.Ed.2d 317 (1972). Nor does defendant appear to bring himself within any of those exceptions to the general rule collected in *Broadrick.*

Nonetheless, I would resolve the standing issue in defendant's favor. At the same time, I believe the court should follow well-reasoned precedent and forthrightly say § 705.1 is constitutionally inapplicable to sexual conduct of spouses in their home, under the holding in *Griswold v. Connecticut, supra.* See *State v. Lair,* 62 N.J. 388, 396, 301 A.2d 748, 753 (1973); cf. *Commonwealth v. Balthazar,* 318 N.E.2d 478 (Mass. 1974).

This would first require an ancillary determination whether the sweep of § 705.1 may be so limited without voiding the statute.

The majority reasons because there are no specific words in § 705.1 which leave room for this or any other construction the statute cannot be salvaged. I do not agree. Whether this court will limit the thrust of a statute or add to it in order to remove constitutional infirmities frequently turns, not on the mechanical construction of the statute's language, but on the exigencies and a pragmatic overview of all surrounding circumstances and policy considerations. See *C. S. C. v. Letter Carriers,* 413 U.S. 548, 571, 93 S.Ct. 2880, 2893, 37 L.Ed.2d 796, 812 (1973) (" * * * our task is not to destroy the Act if we can, but to construe it, if consistent with the will of Congress, so as to comport with constitutional limitations").

The concept of a limiting application often has been recognized by the United

States Supreme Court. Thus *Broadrick v. Oklahoma,* supra, 413 U.S. at 613, 616, 93 S.Ct. at 2916, 2918, 37 L.Ed.2d at 841, 842 relevantly states:

"Facial overbreadth has not been invoked when a limiting construction has been or could be placed on the challenged statute.

\* \* \* \* \* \*

*[W]hatever overbreadth may exist should be cured through case-by-case analysis of the fact situations to which its sanctions, assertedly, may not be applied.*" (Emphasis supplied.)

In *State v. Rasmussen,* 213 N.W.2d 661, 668 (Iowa 1973) we so limited the operative reach of a statute, saying, "[W]e must recognize the *constitutional infirmities* which would result from adopting plaintiff's construction of the Iowa Act. In order to avoid such problems, *we therefore limit the application of sections 204.308 and 204.-101(22), The Code, 1973, to practitioners registered in Iowa.*" (Emphasis supplied.) In *State v. Price,* supra, 237 N.W.2d at 818, we limited the reach of § 724.1 (prohibiting prostitution) to the "buyer and seller of sex in the traditional commercial setting" although the statute on its face is broad enough to proscribe non-commercial sexual activity. In *State v. Farrell,* 209 N.W.2d 103, 106 (Iowa 1973), vacated and remanded, *Farrell v. Iowa,* 418 U.S. 907, 94 S.Ct. 3198, 41 L.Ed.2d 1154 (1974), 223 N.W.2d 270 (Iowa 1974) we held § 32.1, The Code "no longer applicable to the utterance of pure speech." See also *In re Henderson,* 199 N.W.2d 111 (Iowa 1972).

Nor, when the situation has demanded it, have we had any difficulty reading into a statute various safeguards in order to save it from constitutional infirmity. *State v. Monroe,* 236 N.W.2d 24, 37 (Iowa 1975) ("With the unconstitutional portion of the statute eliminated, the constitutionally mandated principle of *Mullaney* must be read into the remainder"); *Catholic Char. of Arch. of Dubuque v. Zalesky,* 232 N.W.2d 539, 546–549 (Iowa 1975) ("Interpreting" Iowa's adoption statute to include constitutionally required notice and hearing); *State v. Drummer,* 254 Iowa 324, 117 N.W.2d 505

(1962) (reading the missing element of intent into § 321.76, The Code, 1954); *State v. Schultz,* 242 Iowa 1328, 50 N.W.2d 9 (1951) (reading the element of intent into § 124.20, The Code, 1950); see *Morissette v. United States,* 342 U.S. 246, 263, 72 S.Ct. 240, 250, 96 L.Ed. 288, 300 (1952) (furnishing the element of intent in 18 U.S.C. § 641).

It is apparent there is no compelling reason to strike down § 705.1 (an action analogous to violating the ancient admonition not to throw the baby out with the bath) when its operation can be limited to those areas which the State may constitutionally regulate.

There are good reasons for salvaging § 705.1 apart from our ever-present motive to avoid a holding of unconstitutionality if reasonably possible. *State v. Aldrich,* 231 N.W.2d 890, 894 (Iowa 1975).

The sure knowledge abolition of § 705.1 would remove all meaningful penalty (until corrective legislative action at some future unknown date) for the most traumatic types of sexual assaults should cause us to weigh carefully any permissible alternative, despite the fact most members of this court may have a subjective reaction that legislative reconsideration and overhaul of the statute is long overdue.

Although there may be a body of opinion that as between willing adults sodomitical acts should be left to moral sanctions alone and eliminated from the criminal law, *no decision from a court of last report in any jurisdiction has been found by the majority which holds such a statute unconstitutional on the ground relied on in the majority opinion.*

For decades courts have upheld sodomy statutes against attacks on constitutional grounds. See the extensive collection of appellate court decisions, Annot., 58 A.L. R.3d 636, 640, 643–648; 70 Am.Jur.2d Sodomy § 2, pp. 805–806; 81 C.J.S. Sodomy § 1 (Supp.1975, n. 33.10). The matter ordinarily has been held to present a question for the legislature and not for the courts. See, e. g., *State v. Bateman,* 113 Ariz. 107, 110–111, 547 P.2d 6, 9–10 (1976); *Carter v. State,*

supra, 255 Ark. at 229, 500 S.W.2d at 371; *People v. Hurd,* 5 Cal.App.3d 865, 877, 85 Cal.Rptr. 718, 726 (1970); *People v. Roberts,* 256 Cal.App.2d 488, 495, 64 Cal.Rptr. 70, 74 (1967); *People v. Ragsdale,* 177 Cal.App.2d 676, 679, 2 Cal.Rptr. 640, 641–642 (1960).

The marriage relationship is not only a valid basis for classification, it is the only rational ground for any interpretive construction of § 705.1. The married family relationship is the fundamental building block in our society, a concept so judicially well recognized it has withstood constitutional attack based on religious freedom in *Reynolds v. United States,* 98 U.S. 145, 165, 25 L.Ed. 244, 250 (1879). See also *Loving v. Virginia,* 388 U.S. 1, 12, 87 S.Ct. 1817, 1824, 18 L.Ed.2d 1010, 1018 (1967).

In short, we may and should concede § 705.1, The Code, sweeps with an unconstitutionally broad brush in absence of a limiting construction. That construction—holding it cannot reach sexual activity of spouses in their home— is a viable alternative the court should adopt. Limiting it in that factual situation pursuant to the plain authority of *Broadrick,* supra, *Rasmussen,* supra, and *Price,* supra, preserves the statute for all other intended sanctions.

### IV. *Does § 705.1, as so limited, violate the equal protection clause?*

The equal protection clause of the fourteenth amendment does not deny to states the power to treat different classes of people in different ways. But a classification must be reasonable, not arbitrary, and must rest upon some ground of difference having a fair and substantial relation to the object of the legislation, so that all persons similarly circumstanced shall be treated alike. *Reed v. Reed,* 404 U.S. 71, 75–76, 92 S.Ct. 251, 253–254, 30 L.Ed.2d 225, 229 (1971).

Defendant reasons that because the constitutional right of privacy in the marital relationship recognized in *Griswold* prevents Iowa's sodomy act from reaching the sexual activity of consenting spouses in the "marital bedroom", consenting non-spouses are entitled to the same protection under the holding in *Eisenstadt,* supra.

But a rational basis for different treatment of non-spouses with respect to sodomy is plain: the law has customarily treated spouses and non-spouses differently with respect to sexual familiarity and conduct. Consider the traditional sex crimes involving non-spouse participants: fornication, see 2 Am.Jur.2d Adultery & Fornication § 8 at p. 967; 37 C.J.S. Fornication § 2 at p. 119 ("A valid and subsisting marriage between the parties accused of fornication renders their sexual relationship legal and precludes a prosecution for fornication"), and lewdness, 53 C.J.S. Lewdness § 3 at p. 9 ("[M]arriage of the parties to each other at the time of the alleged offense is a defense"). If the law may place non-spouses in a class as to fornication and lewdness, certainly it may do so as to sodomy. See *Moore v. State,* 501 P.2d 529 (Okl.Cr.App.1972), cert. denied, 410 U.S. 987, 93 S.Ct. 1517, 36 L.Ed.2d 185 (1973).

On first impression, *Eisenstadt,* supra, appears to treat married and unmarried participants the same, at least with respect to non-sodomitical sex acts. A superficial analysis runs this way: the court held that since spouses may have contraceptives, non-spouses must be allowed to have them; if non-spouses have contraceptives, for what purpose would they have them except to engage in sexual intercourse; therefore a logical projection of *Eisenstadt* requires that spouses and non-spouses be classified the same respecting all sexual activity.

But that interpretation ignores the gist of the *Eisenstadt* opinion. Massachusetts urged its statute's purpose was to deter premarital sexual intercourse. However, the court denied that "deterrence of premarital sex may reasonably be regarded as the purpose of the Massachusetts law." 405 U.S. at 448, 92 S.Ct. at 1035, 31 L.Ed.2d at 359. The court went to considerable length to demonstrate the objective of the Massachusetts anti-contraceptive statute was not to discourage sexual misconduct, stating the statute had "a dubious relation to the State's criminal prohibition on fornication." 405 U.S. at 449, 92 S.Ct. at 1036, 31 L.Ed.2d at 360. At no place did the opinion inti-

mate the fornication statute was unconstitutional as an invasion of privacy. The court concluded the objective of the Massachusetts anti-contraceptive statute was the same forbidden objective as that of the Connecticut statute in the *Griswold* case relating to married couples, that is, interference with "the decision whether to bear or beget a child." 405 U.S. at 453, 92 S.Ct. at 1038, 31 L.Ed.2d at 362. The *Eisenstadt* court held unmarried persons could not be treated differently from married ones with respect to "the right of the individual, married or single, to be free from unwarranted governmental intrusion into matters so *fundamentally* affecting a person *as the decision whether to bear or beget a child.*" (Emphasis supplied.) 405 U.S. at 453, 92 S.Ct. at 1038, 31 L.Ed.2d at 362.

Why would the court be at such pains in *Eisenstadt* to distinguish statutory deterrence of fornication unless such statutes are in a different class and within the competency of the legislature to enact? The objective of our sodomy statute, even less than the objective of a fornication statute, it not to interfere with the right of individuals to decide whether to bear or beget children, but is rather to prohibit what the legislature has determined to be sexual misconduct. The *Eisenstadt* equal protection holding forbids different treatment of non-spouses with respect to limiting procreation, but not with respect to other state-prohibited sexual activities.

Nothing in *Griswold* or *Eisenstadt* requires striking down § 705.1 when it has been properly limited in its reach as suggested in division III, supra. The classification resulting from such limitation has a traditional and constitutional basis. There would be no violation of defendant's equal protection constitutional rights.

V. *Does defendant have a right of privacy which protects him from § 705.1 prosecution?*

Finally, we reach the issue whether non-spouses privately engaging in consensual sodomitical acts are protected by a constitutional right of privacy.

The majority opinion determines this right exists for such persons, based on its interpretation of *Eisenstadt,* supra.

The majority concludes on the basis of Justice Goldberg's concurring opinion in *Griswold v. Connecticut,* supra, 381 U.S. at 497–498, 85 S.Ct. at 1688–1689, 14 L.Ed.2d at 523, that the State must here show *a compelling State interest* to justify its encroachment into "recognized areas of fundamental rights." Of course, this ignores Justice Goldberg's warning that the court's holding in *Griswold*

" * * * in no way interferes with a State's proper regulation of sexual promiscuity or misconduct. As my Brother Harlan so well stated in his dissenting opinion in *Poe v. Ullman,* supra, 367 U.S. at 553 [81 S.Ct. at 1782] 6 L.Ed.2d at 1025].

'Adultery, homosexuality and the like are sexual intimacies which the State forbids . . . but the intimacy of husband and wife is necessarily an essential and accepted feature of the institution of marriage, an institution which the State not only must allow, but which always and in every age it has fostered and protected. * * * '

In sum, I believe that the right of privacy *in the marital relation* is fundamental and basic—a personal right 'retained by the people' within the meaning of the Ninth Amendment." (Emphasis supplied.)

—381 U.S. at 498–499, 85 S.Ct. at 1689–1690, 14 L.Ed.2d at 523–524.

The United States Supreme Court further limited the scope of this privacy right when it said "only personal rights that can be deemed 'fundamental' or 'implicit in the concept of ordered liberty' * * * are included in this guarantee of personal privacy." *Roe v. Wade,* supra, 410 U.S. at 152–153, 93 S.Ct. at 726, 35 L.Ed.2d at 176–177. As noted in *Roe,* "They [later decisions] also make it clear that the right has some extension to activities relating to marriage * * * ; procreation * * * ; contraception * * * ; family relation-

ships * * *; and child rearing and education * * *." (Citations omitted.) *Id.*

The court reiterated the *dependent* nature of the right of privacy in *Paul v. Davis,* —— U.S. ——, 96 S.Ct. 1155, 1166, 47 L.Ed.2d 405, 420, 44 U.S.L.W. 4337, 4343 (1976) when it said: "While there is no 'right of privacy' found in any specific guarantee of the Constitution, the Court has recognized that *'zones of privacy' may be created by more specific constitutional guarantees* and thereby impose limits upon government power." (Emphasis supplied.) Again the court emphasized the normal association of the right in previous decisions had been with matters of marriage and family. See *State v. Price, supra,* 237 N.W.2d at 818 (holding prostitution not entitled to right-of-privacy protection.)

Of course, majority's holding that the right of privacy per se is a fundamental right creates potentially infinite implications. From now on, whenever a litigant challenges a statute on the basis of his right to privacy, the State will have the constitutional burden to prove it has a *compelling interest* in enforcement of the statute. The State would be hard pressed to show a compelling State interest in making arrest records public (see chapter 68A, The Code); or prohibiting use of marijuana in the home (see chapter 204, The Code). The State could also be forced to come up with a compelling interest in prohibiting keeping a house of ill fame (§ 724.3, The Code), regulating massage parlors, prohibiting adultery (§ 702.1, The Code) and bigamy (§ 703.1, The Code), and statutory proscriptions in any number of other areas states have traditionally regulated. The possibilities are limited only by the fertile imagination of our practicing bar.

In contrast with the majority's concept of a privacy right, the right of privacy identified by the United States Supreme Court has never existed in a vacuum. It is found, if at all, accompanying (in tandem fashion) a basic constitutional right so fundamental it merits careful nurture. A litigant's mere invocation of the "right to privacy" will not in itself mandate application of the "com-

pelling interest" test. Rather, according to the United States Supreme Court rationale, we must examine the nature of the *underlying* right sought to be protected to determine whether *it* is "fundamental" or "implicit in the concept of ordered liberty." If it is, the compelling interest test must be met (see *Roe v. Wade,* supra); if it is not, the State need show only a rational basis for its regulation of the activity. *Rinehart v. Brewer,* 360 F.Supp. 105 (S.D.Iowa 1973), aff'd, 491 F.2d 705 (8 Cir. 1974).

Thus the question of the State's burden here logically resolves itself, *not* into the question whether there is an abstract right of privacy present in this case, but instead whether the right of consenting non-spouses to engage in sodomitical activity is *fundamental* in a constitutional sense.

The United States Supreme Court, affirming *Doe v. Commonwealth's Atty. for City of Richmond,* 403 F.Supp. 1199 (E.D. Va.1975), aff'd, 44 U.S.L.W. 3545 (U.S. March 29, 1976), has answered that question in the negative. In *Doe,* the court held that since Virginia's sodomy statute had a rational basis it was not constitutionally infirm. 403 F.Supp. at 1203. The same rational basis attaches to § 705.1, The Code, which, limited as above suggested, is a logical extension of the State's police power. *Carter v. State* supra, 255 Ark. at 231–232, 500 S.W.2d at 372.

Nor would the mere fact these individuals were consenting adults (accepting arguendo defendant's hypothesis) be enough in itself to shield their activity from state regulation. Such an argument was rejected in *Paris Adult Theatre I v. Slaton,* 413 U.S. 49, 68, 93. S.Ct. 2628, 2641, 37 L.Ed.2d 446, 463 (1973):

"Finally, petitioners argue that conduct which directly involves 'consenting adults' only has, for that sole reason, a special claim to constitutional protection. Our Constitution establishes a broad range of conditions on the exercise of power by the States, but for us to say that our Constitution incorporates the proposition that conduct involving consenting adults only is always beyond

state regulation, is a step we are unable to take."

See *State v. Price,* supra, 237 N.W.2d at 817–818.

In overview, it is clear the majority opinion pushes the protection of the United States Constitution far beyond any point suggested by United States Supreme Court decisions. It unnecessarily engineers in complex moral and social areas better left to the legislature. It effectively leaves citizens without deterrent protection from the most offensive of violent crimes. However much in good faith, it accomplishes these results by failing to utilize the legislation-salvaging devices we have readily applied in similar situations, and by failing to appreciate the careful limiting language in *Griswold* and *Eisenstadt.*

I would affirm the judgment below.

MOORE, C. J., and LeGRAND and UHLENHOPP, JJ., join in this dissent.